# Illinois Official Reports

## Appellate Court

***People v. Tepper*, 2016 IL App (2d) 160076**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID M. TEPPER, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0076 |
| Filed | September 23, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 12-CF-1736; the Hon. Liam C. Brennan, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Terry A. Ekl and Tracy L. Stanker, both of Ekl Williams & Provenzale LLC, of Lisle, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa A. Hoffman, Assistant State's Attorney, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices McLaren and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal from a judgment of conviction raises questions of first impression concerning section 33E-17 of the Criminal Code of 1961 (Code) (720 ILCS 5/33E-17 (West 2012)). This statute criminalizes a local government employee's "unlawful participation" in a contract with his or her government employer without the employer's informed consent. Enacted in 1999 (see Pub. Act 90-800, § 5 (eff. Jan. 1, 1999)), the statute provides as follows:

> "Whoever, being an officer, director, agent, or employee of, or affiliated in any capacity with any unit of local government or school district participates, shares in, or receiv[es][1] directly or indirectly any money, profit, property, or benefit through any contract with the unit of local government or school district, with the intent to defraud the unit of local government or school district is guilty of a Class 3 felony." *Id.*

Although this is a question of first impression with respect to section 33E-17, we note that there are similar prohibitions in other Illinois statutes (see 50 ILCS 105/3 (West 2012); 65 ILCS 5/3.1-55-10 (West 2012)), as well as a rich history of precedent addressing undisclosed conflicts of interest by government officials. See, *e.g.*, *People v. Scharlau*, 141 Ill. 2d 180 (1990); *Miller v. County of Lake*, 79 Ill. 2d 481 (1980); *People v. Savaiano*, 66 Ill. 2d 7 (1976). With that in mind, we turn to the facts of this case, which may be stated simply.

¶ 2    In 2005, defendant, David M. Tepper, began working as the manager of the information technology (IT) department of the Forest Preserve District of Du Page County (the District). Defendant was the second-highest-ranking person in the District's IT department. The director of the IT department, and defendant's immediate superior, was Mark McDonald. Like most government agencies, the District has regulations in place that prohibit its employees from obtaining supplemental employment without prior authorization from the District. See Du Page County Forest Preserve District Ordinance No. 92-255 (approved Aug. 4, 1992). The purpose of such rules is to protect against conflicts of interest or other forms of employment that might reflect adversely on the government as an employer. See *Miller*, 79 Ill. 2d at 490. In September 2005, defendant signed a form acknowledging that he had received an employee handbook and was aware of and would abide by the District's regulations, including the prohibition on unauthorized supplemental employment.

¶ 3    In June 2008, defendant became an "independent sales agent" for USA Digital, an Oklahoma-based company that sells equipment and services for wide area networks. Wide area networks, or WANs, are discrete telecommunications and broadband networks, which provide phone service as well as Internet access. USA Digital's agents earn commissions by closing sales contracts for USA Digital's bandwidth and services. In his agent agreement with USA Digital, defendant directed USA Digital to pay his sales commissions not to him directly but instead to a corporation named "Integrated Design Solutions" (IDS), which defendant had established some years earlier. It is undisputed that defendant never disclosed his relationship with USA Digital or IDS to the District.

¶ 4    In January 2009, the District Board held a planning meeting. There, McDonald introduced defendant to the Board. Defendant then gave a presentation in which he told the Board that the District's three-year contract with its then-current WAN provider, Qwest, would be expiring.

---

[1] Here, the legislature has used the word "receiv*ing*" rather than "receives." We merely note the discrepancy, which in this case is immaterial.

Minutes from that meeting indicate that defendant told the Board that the District's network was around 0.8 megabytes per second and that "[s]taff would like to increase this speed to 2.515 megabytes per second to accommodate [the] increased growth of *** applications and requirements." The minutes are ambiguous as to whether it was defendant or McDonald who recommended that, in a new contract with Qwest, the District should seek to increase its network speed by roughly 300%. The minutes indicate that "staff" would, at the Board's next meeting, propose a three-year contract with Qwest costing approximately $21,500 per month.

¶ 5    Inexplicably, the WAN contract was not competitively bid, even though, at the time, competitive bidding was required under state law for all of the District's contracts worth over $20,000. See 70 ILCS 805/8(b) (West 2012). (The limit was recently raised to $25,000. See Pub. Act 99-771, § 10 (eff. Aug. 12, 2016).) At any rate, in March 2009, McDonald and "staff" submitted to the Board a draft resolution seeking to enter into a contract with USA Digital—not Qwest. The Board approved the resolution and in May 2009 the District executed a contract with USA Digital, which ran from September 2009 to October 2012. Under the agreement, the District would pay USA Digital around $28,600 a month, or $1,030,000, for three years of broadband service. The Board's president and a commissioner both testified that the resolution would not have been adopted and the contract would not have been executed had the District known of defendant's connection to IDS or USA Digital.

¶ 6    Once the deal was closed with the District, USA Digital began to pay commissions to IDS, including a $12,000 bonus for the contract itself and approximately $2000 per month for each month of the contract. A few months into the contract, a vice president from USA Digital came to Du Page County to meet with defendant (who was "USA Digital's sales agent") and "the client," *i.e.*, McDonald, who was the District's "representative." The vice president did not know that defendant worked for the District, or that defendant worked with McDonald, or that McDonald stood to gain anything from defendant's commissions. The vice president thought he was supervising defendant as a sales agent.

¶ 7    The scheme was discovered in November 2011. Shortly thereafter defendant and McDonald left the District's employment, and USA Digital ceased its commission payments to IDS in July 2012, which was 29 months into the contract. By that time, IDS had received nearly $80,000 in commissions, and evidence showed that both defendant and McDonald had made withdrawals from IDS's bank account.

¶ 8    The State charged defendant and McDonald with a number of offenses. Specifically, defendant was charged with 29 counts of unlawful participation, one for each of the monthly commission payments deposited into IDS's bank account (the first three deposits included defendant's $12,000 bonus), which were withdrawn by either defendant or McDonald. Defendant opted for a severed bench trial at which the evidence we have discussed was presented. In closing argument, defendant asserted that his participation in the USA Digital contract was not "with the intent to defraud" as required under section 33E-17, because the Forest Preserve "had not sustained any *** pecuniary loss." Rather, defendant argued, the District had received the telecom services for which it had contracted; furthermore, one of the District's commissioners even testified that the USA Digital contract seemed like "a good deal." Defendant also argued that a conviction of the offense of unlawful participation could not be based on "an omission," which is how defendant characterized his failure to disclose his financial interests and his supplemental employment to the District. Instead, according to

defendant, a conviction of unlawful participation would have to be based on some "affirmative act" of deception.

¶ 9       In finding defendant guilty, the trial court disagreed with both arguments, stating as follows:

> "I think all the parties would have to agree that if a public employee in Tepper's position disclosed to his [employer] a relationship such as the agency relationship with USA Digital and the Forest Preserve, nevertheless, went ahead with the contract, no one could argue an intent to defraud in that circumstance. But absent such a disclosure in this context, I find that Tepper's actions do, in fact, constitute an intent to defraud. Indeed, Tepper's intent to defraud can be more easily gleaned when one considers the fact that he is, essentially, sharing half of the USA Digital commissions with his boss, Director McDonald. Clearly, this transfer of Forest Preserve monies, albeit indirectly, is designed to defraud the Forest Preserve."

In addition, the court found that the victim need not sustain a pecuniary loss; rather, the court found, "deception coupled with bringing financial gain to one's self can equal the intent to defraud" for purposes of the unlawful participation statute.

¶ 10      At sentencing, defendant argued that the court should enter only a single sentence for one count of unlawful participation. The trial court disagreed and sentenced defendant to two years' probation with 180 days to be served in the county jail on each of the 29 unlawful participation counts. The court ordered defendant to pay a single $83,000 fine as opposed to restitution. The court stated that, while the District might not have suffered a pecuniary loss, defendant was not entitled to keep his "ill-[ ]gotten gains." The court further stated that defendant's sentence was "necessary to deter other public employees from engaging in [similar] criminal conduct."

¶ 11      Defendant timely appealed and requested a stay of his sentence, which we granted. As noted, this is a case of first impression concerning section 33E-17, and it requires us to determine whether the intent-to-defraud element in the unlawful participation statute requires that the offender commit some affirmative act of deception and also whether it requires that the victim suffer some sort of pecuniary loss. Now, with the benefit of full briefing, we determine that the statute contains neither requirement and, accordingly, we lifted our stay by separate order.

¶ 12      Defendant's primary contention is that his conviction was based on insufficient evidence of his "intent to defraud" and that no reasonable trier of fact could have found otherwise. *Cf. Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). But defendant's sufficiency-of-the-evidence argument puts the cart before the horse. The overarching question raised by his argument concerns our construction of the phrase "with the intent to defraud" in section 33E-17—whether it requires an "affirmative act" on the defendant's part as opposed to "an omission" (again, these are defendant's labels, not ours), and whether it also requires that the victim in an unlawful participation scheme sustain some sort of concrete financial loss. These are questions about what the statute requires and not necessarily challenges to the State's evidence. Therefore, to the extent that defendant's arguments present questions of statutory interpretation, we review them *de novo*. *People v. Cardamone*, 232 Ill. 2d 504, 511 (2009).

¶ 13      We first address defendant's contention that unlawful participation requires an "affirmative act" of deceit as opposed to "mere silence." According to defendant, he had no

"legal duty" to disclose his connections to IDS and USA Digital to the District and thus "an omission" concerning his financial interests could not amount to fraud, or conduct undertaken "with the intent to defraud," under section 33E-17. For support, defendant relies on the voluntary-act requirement in section 4-1 of the Code (720 ILCS 5/4-1 (West 2012)), which plainly does not support defendant's position. It is true that "a voluntary act" is a material element of every criminal offense, but a voluntary act "*includes* an omission to perform a duty which the law imposes on the offender." (Emphasis added.) *Id.* And the duty "the law" imposed on defendant was not fiduciary (see *People v. Grever*, 222 Ill. 2d 321, 337 (2006)); rather, the duty "the law" imposed on defendant was not to violate "the law"—in this case, section 33E-17, the statutory prohibition against unlawful participation—whether by voluntary act or (in this case) by voluntary omission. *Cf. People v. Banks*, 161 Ill. 2d 119, 132-33 (1994) (rejecting similar argument that charges were based on an "omission" to perform under "a legal duty" in a case of child neglect).

¶ 14 True enough, defendant's deception was carried out in large part by his silence, as opposed to speech, concerning his supplemental employment, but in the context of fraud, that is a distinction without a difference. Like speech, silence can be *intentionally* misleading, and when silence is intentional, it can be deemed "as much a fraud at law as an actual affirmative false representation or act." (Internal quotation marks omitted.) *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 40 (collecting cases); see also *People v. Yarbrough*, 128 Ill. 2d 460, 473 (1989) (explaining that fraud is any conduct that is "calculated to deceive"). As another panel of this court recently wrote, "[f]raud encompasses anything calculated to deceive, as in acts, omissions and concealment *including \*\*\* silence* if accompanied by deceptive conduct or [the] suppression of material facts." (Emphasis added and internal quotation marks omitted.) *People v. Oshana*, 2012 IL App (2d) 101144, ¶36. So, to the extent that section 33E-17 requires an affirmative act, silence meets that requirement.

¶ 15 Defendant also argues that a conviction of unlawful participation under section 33E-17 requires the State to plead and prove that a unit of local government sustained a concrete pecuniary loss as a result of the defendant's conduct. We hold that there is no such requirement.

¶ 16 Defendant's argument is a variation on a common defense raised by criminal defendants in theft-by-deception, fraud, and false-pretenses cases. In such cases:

> "The defendant sometimes urges in his defense that, when the transaction which his misrepresentations brought about was over, the victim had suffered no pecuniary loss. \*\*\* Of course, a civil suit would not lie against the defendant when the victim suffered no damage, at least if the victim made out as well financially as he bargained for.[ ] But on the criminal side, it is generally held that the lack of financial loss [to the victim] is no defense to false pretenses." 3 Wayne R. LaFave, Substantive Criminal Law § 19.7(i)(3) (2d ed. 2003).

¶ 17 Illinois case law bears out Professor LaFave's conclusion. It has been held that proof of a victim's lack of financial loss is no impediment to a conviction of odometer-rollback fraud (*Yarbrough*, 128 Ill. 2d at 479) or workers' compensation fraud (*Oshana*, 2012 IL App (2d) 101144, ¶ 31) or theft by deception (*People v. Haissig*, 2012 IL App (2d) 110726, ¶ 23). This no-loss-needed understanding of fraud and theft by deception is the prevailing view in most other jurisdictions as well. See *Haissig*, 2012 IL App (2d) 110726, ¶¶ 36-43 (collecting cases); *United States v. Bush*, 522 F.2d 641, 646 (7th Cir. 1975); LaFave, *supra* § 19.7(i)(3). Notably,

- 5 -

however, in *Yarbrough*, our supreme court stated that "[a]long with a wrongful intent, the elements of fraud include making a false representation of a material fact, knowing or believing it to be false and doing it for the purpose of inducing the other party to act." *Yarbrough*, 128 Ill. 2d at 473. While we would add to *Yarbrough* that a false representation can be "ma[de]" silently as shown above, conspicuously absent from the supreme court's statement is any mention of a victim or any requirement that the victim incur some tangible, pecuniary loss.

¶ 18       From these cases, we could deduce that, under the common-law understanding of fraud and the phrase "with the intent to defraud," it is *not* a condition precedent to a conviction under section 33E-17 that the victim of the fraud suffer some proven pecuniary loss. But we need not rest our interpretation of section 33E-17 on the common law alone, for article 17 of the Code, which defines and proscribes other offenses based on fraud and deception, specifically defines the phrase "with intent to defraud" as follows:

> " 'With intent to defraud' means to act knowingly, and with the specific intent to deceive or cheat, for the purpose of [(1)] causing financial loss to another *or* [(2)] *bringing some financial gain to oneself, regardless of whether any person was actually defrauded or deceived.*" (Emphasis added.) 720 ILCS 5/17-0.5 (West 2012) (previously 720 ILCS 5/17-1(A)(iii) (West 1998)).

Although the unlawful participation statute resides in article 33E of the Code, which addresses offenses pertaining to official misconduct and bribery, sections 33E-17 and 17-0.5 address the same subject—fraud. And since these statutes address the same subject, under the *in pari materia* canon, we read them together. See *People v. Bingham*, 2014 IL 115964, ¶ 42; *People v. Rinehart*, 2012 IL 111719, ¶ 26. Therefore, given the definition of "with intent to defraud" in article 17 of the Criminal Code, we determine that defendant's unlawful participation conviction under section 33E-17 may be affirmed regardless of whether the State proved that the District suffered any financial loss.

¶ 19       Defendant implies that this result is unfair; if the State did not prove that the District suffered any "loss," then there was no harm and thus no foul. As we explained in *Oshana*, however, a variety of criminal acts are so inherently or potentially harmful—conspiracy, perjury, unlawful entry, attempt to commit a crime, and (in *Oshana* specifically) workers' compensation fraud—that they do not require that the crime is successful, or pays off, or results in any actual harm to any identifiable victim. *Oshana*, 2012 IL App (2d) 101144, ¶ 39. Whether unlawful participation fits within this category of no-loss-needed offenses is a matter for the General Assembly, not this court. *Id.*

¶ 20       We also reject defendant's argument that, just because the State did not prove that the District suffered any pecuniary loss, it was proved that the District suffered no loss at all. The harm in a no-financial-loss fraud case can be subtle in a sense, but its impact on fair commerce, if undeterred, is self evident:

> " 'A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.' " *Haissig*, 2012 IL App (2d) 110726, ¶ 59 (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)).

Put differently, when one "t[akes] advantage" of another through any scheme, "it is immaterial that the scheme took the form of an ordinary business transaction." *People v. Keyes*, 269 Ill. 173, 180 (1915).

¶ 21    But we cannot say as a practical matter that the District suffered *no loss* here. First, by accepting the USA Digital contract and by committing revenue toward it, the District incurred opportunity costs; *i.e.*, it suffered the diminished opportunity to obtain a more financially favorable contract. See, *e.g.*, *United States v. Castor*, 558 F.2d 379, 384 (7th Cir. 1977). But worse, the District, as a consumer, was forced on the basis of incomplete information to subsidize defendant's gains. If the District "and other public officials had known of [defendant's] interest they could have rightfully negotiated [a wide area network] contract which might have earned those profits for the [District]." *Bush*, 522 F.2d at 648; see also *Savaiano*, 66 Ill. 2d at 14 ("[i]t appears that [the defendant's personal] profit could have been due to his position of public trust while negotiating for the sale"). The net result was that defendant, through his scheme, hoodwinked the District into making a deal with USA Digital—and in so doing caused the District to breach its own conflict-of-interest rules. "The deal may [even] have been a good one for the [District]; the problem is that [defendant] deprived the [District] of making a better deal, of the best deal possible, in order that he might share in the profits." *Bush*, 522 F.2d at 648; see also *Haissig*, 2012 IL App (2d) 110726, ¶ 59 (" 'Here, the State suffered a deprivation because, by [the defendant's] deceptive acts, it lost control over to whom its money was paid, even though the money paid was used to purchase goods the State needed and otherwise would have purchased.' " (quoting *State v. Bouchard*, 2005 ME 106, ¶ 12, 881 A.2d 1130)). And all of this says nothing about the reputational damage done to the District by its employees' betrayal of the public trust or of the fact that the District's revenues (which subsidized defendant's commissions from USA Digital) were derived from the property taxes the District levies on the citizens of Du Page County.

¶ 22    We determine that there was sufficient evidence for the trial court to conclude that defendant acted with the intent to defraud the District. Defendant became a sales agent for USA Digital in June 2008. Defendant's failure to disclose his supplemental employment to the District was effectively a misrepresentation that he, and by extension the District, had no undisclosed conflicts when the District began its negotiations with USA Digital. But defendant's "silence" concerning his supplemental employment was not the State's only evidence. There was also the IDS bank account where defendant had USA Digital deposit his commissions, which allowed defendant to split the commissions with McDonald without alerting the District or USA Digital to McDonald's involvement. *Cf. People v. Haycraft*, 3 Ill. App. 3d 974, 982 (1972) (noting that the defendant's "certain knowledge that large sums of money were being deposited in his *** bank account [is] sufficient to constitute him an active wrongdoer" in a scheme to defraud). Then, too, there was the lunch meeting where USA Digital's vice president met with defendant and McDonald; defendant and McDonald pretended as though they did not work together, and defendant never let on that he worked for the District. It was not unreasonable to infer that defendant and McDonald put on this lunchtime ruse to avoid tipping off USA Digital's vice president, who in turn might have notified the District. These were all "affirmative acts."

¶ 23    It may well be that USA Digital and the District ultimately would have entered into the exact same contract had both sides known of defendant's conflict of interest; as the trial court noted, that would have been a largely unobjectionable arm's-length transaction. But when the

- 7 -

evidence is taken together, a trier of fact could quite reasonably find that defendant's actions were neither isolated nor inadvertent, but rather were part and parcel of an intentionally fraudulent scheme undertaken for his (and McDonald's) financial gain. See *Yarbrough*, 128 Ill. 2d at 473; *Savaiano*, 66 Ill. 2d at 19; *Oshana*, 2012 IL App (2d) 101144, ¶¶ 31-33.

¶ 24 That said, we agree with defendant that he should have been sentenced on only one count of unlawful participation. Under the one-act, one-crime rule, a single sentence will be entered for each completed crime. *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 46 (citing *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996), and *People v. King*, 66 Ill. 2d 551, 566 (1977)); *People v. Houston*, 288 Ill. App. 3d 90, 100-02 (1997). The word "act" in the context of the one-act, one-crime rule is a term of art. It does not mean *any* action, but only that which, for the purpose of imposing a distinct sentence, constitutes a complete " 'unit of prosecution' " (*People v. Sedelsky*, 2013 IL App (2d) 111042, ¶ 15 (quoting *People v. Carter*, 213 Ill. 2d 295, 302 (2004)), or is "capable of independently sustaining a complete criminal conviction" (*People v. Crespo*, 203 Ill. 2d 335, 340 (2001)).

¶ 25 The State argues that the crime of unlawful participation was complete each time IDS received a commission payment from USA Digital. Defendant argues that the crime was complete once the District began to pay defendant "indirectly" through its contract with USA Digital. As we explain, both interpretations are reasonable, and so the statute is ambiguous.

¶ 26 We start with the language of the statute. See *Carter*, 213 Ill. 2d at 301. Again, section 33E-17 states in relevant part, "Whoever, being an *** employee *** affiliated *** with any unit of local government *** participates, shares in, or receiv[es] directly or indirectly any money, profit, property, or benefit through any contract with the unit of local government *** with the intent to defraud the unit of local government, *** is guilty of a Class 3 felony." 720 ILCS 5/33E-17 (West 2012).

¶ 27 We agree with defendant that, insofar as the one-act, one-crime rule is concerned, section 33E-17 is ambiguous. The principal problem with the statute in this regard is that it is unclear what the phrase "with the intent to defraud" actually modifies and thus what act must be undertaken fraudulently. One does not, for example, "share[ ] in, or receive[ ]" money—whether directly or indirectly or through a contract—"with the intent to defraud" because the receipt of money in and of itself would not be "fraudulent"; the fraud lies in the act or representation that induced the money to be paid. More importantly, the "fraud" in an official conflict-of-interest case lies in the undisclosed conflict because an undisclosed beneficiary to the contract was not intended. In such situations, "[t]he evil exists because the official is able to influence the process of *forming* a contract" (emphasis added) (*Savaiano*, 66 Ill. 2d at 15), and that is true regardless of how the performance of the contract is ultimately carried out.

¶ 28 The statute's primary purpose is clear: it was intended to prevent conflicts of interest and kickbacks. See generally 90th Ill. Gen. Assem., House Proceedings, Dec. 1, 1998, at 10-11. And, "[l]ike most other conflict of interest provisions," the statute "is aimed not only at the actual bad faith abuse of power for [a public employee's] own personal benefit, but is also designed to prevent the creation of relationships which carry in them the potential of such abuse, by removing the possibility of temptation." *Brown v. Kirk*, 64 Ill. 2d 144, 151 (1976). And, as has been pointed out on numerous occasions, when a government employee deceives his or her employer, and participates in a kickback scheme, the employee has committed a quintessential act of fraud. See *Skilling v. United States*, 561 U.S. 358, 413 (2010); *United*

*States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015). But that sheds little light on whether the legislature intended to punish each unlawfully-entered-into contract separately or each unlawfully-received-payment separately.

¶ 29  We have carefully considered the statute, its legislative history, and related cases. Still, we can no more than guess (see *People v. Gutman*, 2011 IL 110338, ¶ 43) as to the unit of prosecution under the statute. Accordingly, under lenity principles, "we must adopt a construction that favors the defendant" (*Carter*, 213 Ill. 2d at 302), and here, that construction leads to the conclusion that the contract itself is the unit of prosecution, regardless of how many payments the defendant indirectly received. Conversely, if, as the State has suggested, the legislature intended to punish each receipt of proceeds from a conflicted contract separately, it stands to reason that the legislature would have said so unambiguously. See *id.*; *People v. Segara*, 126 Ill. 2d 70, 75 (1988); *cf. People v. Almond*, 2015 IL 113817, ¶ 39 ("the legislative intent to permit separate convictions for simultaneous possession of a firearm and ammunition under the UUW by a felon statute could not be clearer").

¶ 30  Our interpretation of section 33E-17 is supported by *Houston*, 288 Ill. App. 3d 90. There, the defendant, whose telephone service in her own name had been disconnected for nonpayment, obtained telephone service by twice reapplying under a different name. *Id.* at 92. She was convicted of eight separate counts of telephone fraud, one count for each month that she obtained service by reapplying under a different name. *Id.* The Fourth District remanded for resentencing, noting that the defendant was guilty of, at most, two counts of telephone fraud, one for each fraudulent misrepresentation of her name. *Id.* at 99-100. Accordingly, the State could not apportion each of the defendant's successful fraudulent misrepresentations into four criminal acts simply "because [the phone company] chooses to bill its customers on a month-to-month basis." *Id.* at 100. So, too, the court said, "[t]he making of each call once telephone service has been fraudulently obtained does not constitute a new offense, unless the defendant commits some fresh fraud." *Id.* at 100-01.

¶ 31  A similar result was reached by a panel of this court in *People v. Patrick*, 406 Ill. App. 3d 548 (2010). There, it was held that a defendant could be sentenced on only one count of failing to report an accident because, although the accident had four victims, all of the convictions were "based on the same physical act of leaving the scene of an accident." *Id.* at 560.

¶ 32  The logic of *Houston* and *Patrick* applies to the unlawful participation statute with equal force. We have determined that the unit of prosecution under section 33E-17 is the contract itself. We note that the contract in this case had a yearly opt-out provision, and so it could be argued that each year the contract was not terminated resulted in a new contract and thus a separate unit of prosecution. See generally *Lawrence v. Illinois Life & Health Guaranty Ass'n*, 293 Ill. App. 3d 489, 491 (1997). But that was not how this case was charged, and the State presented no evidence concerning defendant's role, if any, in the District's decision not exercise its yearly option.

¶ 33  Since defendant received concurrent sentences, we need not remand this case for resentencing. For the reasons stated, we affirm in part and vacate in part the judgment of the circuit court of Du Page County. Twenty-eight of defendant's convictions and sentences for unlawful participation (counts 111-13, 115-38, 140) are hereby vacated. Defendant's lone remaining conviction and sentence for unlawful participation (count 110) are affirmed. In addition, we grant the State's request and hereby assess defendant statutory State's Attorney

fees of $50 (55 ILCS 5/4-2002 (West 2012)) as part of our judgment.

¶ 34        Affirmed in part and vacated in part.