## ILLINOIS OFFICIAL REPORTS

---

**People v. Oshana, 2012 IL App (2d) 101144**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JIM OSHANA, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-1144 |
| Filed | February 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions on two counts of workers' compensation fraud and the entry of an order for restitution, the appellate court reversed the conviction on the count charging that defendant made a false claim for workers' compensation benefits, since there was insufficient evidence of such a violation, especially in the absence of a showing that defendant did not have a compensable claim or that some other aspect of his claim was fraudulent, but his conviction on the count charging that he intentionally made a false or fraudulent material statement to obtain benefits was upheld on the ground defendant misrepresented his level of pain and his inability to use his right hand and arm, and, further, the restitution order was reduced by the cost of surveillance that occurred before defendant's fraudulent statements came to light and was not the result of his criminal acts. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 09-CF-1166; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Affirmed as modified in part and reversed in part. |

| Counsel on<br>Appeal | Joseph Younes, of Law Offices of Joseph Younes, of Chicago, for appellant. |
| | |
| | Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justice Burke concurred in the judgment and opinion.<br>Justice Hutchinson specially concurred, with opinion. |

# OPINION

¶ 1      On August 5, 2010, the trial court found the defendant, Jim Oshana, guilty of two counts of workers' compensation fraud (820 ILCS 305/25.5(a) (West 2006)). He was sentenced to 24 months' probation, fined, and ordered to pay restitution in the amount of $22,594.61 to Gallagher Bassett, the administrator of workers' compensation benefits for the defendant's employer, to reimburse it for the costs of investigating the defendant's workers' compensation claim and its attorney fees. The defendant appeals, arguing that the statute is unconstitutionally vague, that there was insufficient evidence to convict him, and that Gallagher Bassett is not entitled to restitution for certain expenses. We affirm as modified in part and reverse in part.

¶ 2                              BACKGROUND

¶ 3      The defendant began working for Plote Construction, Inc., in February 2006. On October 12, 2006, the defendant missed his footing as he was climbing out the back of a truck trailer he had been washing out and he fell to the ground, injuring his right arm and shoulder. He reported the injury to Plote's safety director, left work, and went to the emergency room at Alexian Brothers Medical Center. Staff there took X-rays of his shoulder. He was told not to go back to work and advised to see a specialist at Sherman Clinic. Plote's safety director contacted Gallagher Bassett that same day to report the defendant's injury.

¶ 4      On October 16, 2006, the defendant visited Sherman Clinic, where he was given medication, restrictions on his physical activities, and an order to stay off work. Around this time, Pamela Hathaway, a senior claims representative for Gallagher Bassett, contacted a private investigation company named Infomax to perform surveillance on the defendant.

¶ 5      The defendant saw an orthopedic surgeon, Dr. Sarmed Elias, on October 19, 2006. The defendant reported that his level of pain from his shoulder was 9 on a scale from 1 (the least

pain) to 10. Dr. Elias had an MRI taken of the defendant's shoulder and told him to remain off work for two weeks.

¶ 6　　　On October 25, 2006, Infomax employee Wayne Otto conducted surveillance of the defendant's home, beginning at about 6 a.m. At about 3 p.m., Otto observed (and videotaped) the defendant returning home. The defendant carried groceries from the car to the house using his right hand and also pulled garbage cans out to the curb. On October 31, 2006, Otto again conducted surveillance on the defendant and followed him as he drove from his home to a construction site at Benito Juarez High School in Chicago. Once there, the defendant put on a hard hat and appeared to be involved in overseeing various contractors, doing tasks such as carrying blueprints and multiple cups of coffee without any signs of disability. The defendant worked an entire day there.

¶ 7　　　On November 2, 2006, Otto again followed the defendant to the high school, where the defendant again wore a hard hat. Otto described the defendant's movements as "uninhibited." Otto lost sight of the defendant about noon. The defendant saw Dr. Elias that same day. The defendant filled out an Oswestry (intake) form on which he reported that his level of pain was between a 9 and a 10. Dr. Elias used the Oswestry forms his patients gave him to calculate their levels of disability. On November 2, 2006, Dr. Elias computed that the defendant was 70% disabled because of his neck. (At trial, Dr. Elias explained that there was an overlap between shoulder symptoms and the neck.) Dr. Elias reviewed the defendant's MRI with him, opining that the defendant had suffered a staggered complete tear of the right shoulder rotator cuff tendon. Dr. Elias recommended that the defendant undergo a carpal tunnel release and an epidural injection for herniated disks in his lower back, and he made a note that the defendant's rotator cuff would need repair. Dr. Elias gave the defendant medication and ordered him to stay off work for another two weeks.

¶ 8　　　The next day, November 3, Hathaway conducted a telephone interview with the defendant covering various topics. Early in the interview, Hathaway asked the defendant whether he had graduated from high school. The defendant replied that he did not graduate and then said, "I do have a diploma high school background, but a different country." Hathaway then asked the defendant to tell her about the October 12 accident and he did so. After that, the following exchange occurred:

　　　"Q. [Hathaway]: And I'm going to go back to your employer. You work for Plote and you work. So you're full-time, correct?

　　　A. [the defendant]: Correct.

　　　Q. Alright [*sic*]. And you work the night shift. Now do you work for anyone else?

　　　A. No.

　　　Q. No other employers. Are you an independent contractor for anybody?

　　　A. No ma'am.

　　　Q. And do you own your own business?

　　　A. No ma'am."

¶ 9　　　On November 8, 2006, the owner of Infomax, Dean Gluth, conducted surveillance on the defendant. Gluth observed that the defendant was carrying a beverage cup in his right hand

as he left his house. Gluth followed the defendant as he drove to a different construction site at the 68th Street Pumping Station. Gluth videotaped the defendant using both hands as he used his cell phone, gave directions, took pictures of the site, and carried and rolled and unrolled blueprints throughout the day. The defendant also picked up some temporary fencing and moved it.

¶ 10     The next day, November 9, Otto followed the defendant to the 68th Street work site again. When he arrived, the defendant began tightening the orange plastic fencing around the site, using both arms without any apparent restriction. Otto watched the defendant "pull with force to straighten one of the poles [holding the fencing] back up from the ground." According to Otto's trial testimony, the defendant pulled "in a stretched manner," using both arms equally, rather than using leverage to move the pole. The defendant also performed a number of other tasks throughout the day in which he used both arms. This was the last date when Infomax conducted surveillance on the defendant. Infomax prepared a report on the surveillance dated November 15, 2006, and sent it to Gallagher Bassett. Gluth later compiled all of the videotapes of the defendant onto one tape, which was entered into evidence at trial.

¶ 11     At trial, Wassim Kmeid, the owner of a land development and construction company called Beritus, Inc., testified that during the winter of 2006 he was working on two construction sites, Benito Juarez High School and the 68th Street Pumping Station. Kmeid subcontracted the supervision of the subcontractors at the two sites to Sunset Construction. The defendant was the person with whom Kmeid dealt at Sunset, and the defendant submitted time sheets for his work to Kmeid. The defendant worked a total of 27 days between October 24 and November 30, 2006, for which Kmeid paid Sunset $5,180.

¶ 12     The defendant filed an application for workers' compensation benefits on November 14, 2006. In it, the defendant stated that, as a result of his fall on October 12, he had sustained "[s]evere injuries" to his back, neck, and shoulder. On November 16, the defendant saw Dr. Elias. The defendant reported that his shoulder pain was level nine and his neck pain was level eight. Based on these responses Dr. Elias calculated that the defendant was 98% disabled because of his lower back and 84% disabled because of his neck. Based on his examination of the defendant, Dr. Elias believed that the defendant could not work. The defendant saw Dr. Elias again on November 30, 2006. At that point, the defendant reported that he was "in bed most of the time," that he had to "crawl to the toilet," and that he could walk only with the help of a cane or crutches. Despite this description and Dr. Elias's belief that the defendant needed surgery to repair his rotator cuff tear as soon as possible, Dr. Elias released the defendant to light-duty work on November 30. Plote's safety director, William Ryan, testified that it was Plote's policy to require a "full release," not a light-duty release or a release with restrictions, in order to allow an injured employee to return to work. Thus, the defendant could not return to work for Plote. Dr. Elias saw the defendant on January 4, 2007, at which time the defendant showed some improvement in his level of pain but still was not cleared to return to work.

¶ 13     On January 5, 2007, the defendant filed a petition under section 19(b) of the Workers' Compensation Act (Act) (820 ILCS 305/19(b) (West 2006)) in which he sought temporary total disability (TTD) benefits for his injury. In a motion accompanying that petition, the defendant stated that he had been "disabled from work from 10/12/06 until [the] present" but

had not yet received any benefit payments, and he sought to have penalties imposed on Plote and Gallagher Bassett for unreasonably withholding payment. In February 2007, Gallagher Bassett issued the defendant a check for $7,000 as an advance on TTD. Hathaway testified that, by the time the payment was made, she knew that the defendant had been working somewhere other than Plote. Nevertheless, the decision was made to go ahead and make the payment, and the defendant's injury was categorized as a compensable injury in Gallagher Bassett's records.

¶ 14        On April 27, 2007, at the request of Gallagher Bassett, the defendant was seen by Dr. David Zoellick, an orthopedic surgeon. The defendant reported that any motion of his right arm caused pain, there was a "burning sensation radiating down his right arm," and he could not raise his right arm. The defendant said that he was driving with only his left hand. The defendant stated that he had not had any neck or back pain before the accident and that he had not been further injured since the accident. Dr. Zoellick examined the defendant and reviewed the medical records from Dr. Elias. Dr. Zoellick diagnosed the defendant as having intrasubstance changes in his rotator cuff and a subchrondal cyst in the lateral aspect of the humeral head. Dr. Zoellick told Gallagher Bassett that the defendant could possibly return to work in six to eight weeks. After his examination of the defendant, however, Dr. Zoellick was given the videotape of the defendant to watch. Viewing the tape changed Dr. Zoellick's opinion of the severity of the defendant's condition, to the point that he believed that the defendant could return to work immediately. At trial, Dr. Zoellick testified that the videotape contradicted the defendant's reports about his condition in several ways, including in his ability to raise his right arm.

¶ 15        In June 2007, Gallagher Bassett issued one other payment of $3,918.21, which it classified as an advance on permanent partial disability of 2½% of one arm. Plote's attorney handling the defense of the defendant's workers' compensation claim in 2008 testified that Gallagher Bassett's investigation was not complete when it issued the checks to the defendant, but Gallagher Bassett paid "under protest" to avoid penalties. Strikingly, so far as can be determined from the record, no hearing was ever held on the defendant's workers' compensation claim related to the October 2006 accident, and that claim remains pending at the present time, over five years later.

¶ 16        In 2008, the defendant had two workers' compensation claims pending with the Illinois Workers' Compensation Commission, the one from 2006 and another from 2007. In November 2008, an investigative division of Gallagher Bassett contacted the antifraud unit of the Commission. Elizabeth Lawrence, an investigator with the antifraud unit, testified that as a result of that contact she began an investigation into the defendant's 2006 claim. After she reviewed the case, she referred the matter to the Kane County State's Attorney's office for prosecution, because she believed that the following things showed fraud by the defendant: the defendant's claims to his doctors to have certain physical limitations, the videotape showing the defendant performing work that was inconsistent with those claims, and the fact that the defendant was working during a time that he alleged that he was disabled.

¶ 17        On April 22, 2009, the defendant was indicted on two counts of workers' compensation fraud: one under section 25.5(a)(1) of the Act, and the other under section 25.5(a)(2). Those

provisions read as follows:

> "(a) It is unlawful for any person, company, corporation, insurance carrier, healthcare provider, or other entity to:
>
> (1) Intentionally present or cause to be presented any false or fraudulent claim for the payment of any workers' compensation benefit.
>
> (2) Intentionally make or cause to be made any false or fraudulent material statement or material representation for the purpose of obtaining or denying any workers' compensation benefit." 820 ILCS 305/25.5(a)(1), (a)(2) (West 2006).

On March 2, 2010, the first day of the bench trial, the State was allowed to amend its indictment to allege the factual basis for each charge. As to count I, alleging a violation of subsection (a)(1), the State alleged that the defendant "intentionally presented a false material representation for the payment of workers' compensation benefit, in that said defendant claimed to the Illinois Workers['] Compensation Commission, his employer's worker[s'] compensation insurance provider, and to a worker[s'] compensation insurance claims adjuster that he was totally disabled and unable to work" due to an accident that occurred while he was employed by Plote. As to count II, charging a violation of subsection (a)(2), the amended indictment alleged that the defendant "intentionally presented a false material statement for the purpose of obtaining worker[s'] compensation benefits," in that he claimed to the Commission and Plote's insurance provider that "he was totally disabled and unable to work" and also told a Gallagher Bassett insurance claims adjuster that he was not working for anyone else. The State presented its case-in-chief, including the witnesses and evidence described above, over two days. The case was then continued until April 2010, when the State rested and the defendant filed a motion for a directed finding. The State filed a written response, and the trial court denied the motion. The parties returned to court on August 5, 2010, when they made their closing arguments and the trial court found the defendant guilty of both counts. The defendant filed a motion for a new trial, which the trial court denied.

¶ 18 On October 20, 2010, the defendant was sentenced. The trial court merged the convictions on the two counts under the one-act, one-crime doctrine. The defendant was sentenced to 24 months' probation and ordered to pay, in addition to various fines and fees due to the State, restitution in the amount of $22,594.61 to Gallagher Bassett pursuant to section 25.5(b) of the Act. That provision reads:

> "(b) *** Any person or entity convicted of any violation of this Section shall be ordered to pay complete restitution to any person or entity so defrauded in addition to any fine or sentence imposed as a result of the conviction." 820 ILCS 305/25.5(b) (West 2006).

The amount of restitution included: $5,923.50 in attorney fees relating to the criminal case; $5,105 for Dr. Zoellick's independent medical examination of the defendant; $9,671.05 in surveillance costs; about $1,418 in other investigation costs; and about $477 in costs for medical records. Gallagher Bassett did not ask that the defendant repay any of the amounts it tendered directly to him or his doctors for his October 2006 injury or for attorney fees associated with the underlying workers' compensation claim. The defendant filed a timely appeal.

¶ 19                                  ANALYSIS

¶ 20        On appeal, the defendant raises several arguments: (1) sections 25.5(a)(1) and (a)(2) of the Act are void because they are unconstitutionally vague; (2) even if the statute is not so vague that it is unconstitutional, it is ambiguous and therefore the rule of lenity should be applied; (3) the evidence was insufficient to support the defendant's convictions because the State failed to prove beyond a reasonable doubt that he had the requisite intent, that he presented a false or fraudulent claim, or that he made a false or fraudulent material representation; (4) the trial court's factual findings were in error; and (5) the restitution that he was ordered to pay to Gallagher Bassett included costs that were not proper "out-of-pocket expenses" under section 5-5-6 of the Unified Code of Corrections (730 ILCS 5/5-5-6 (West 2008)). We address all of these arguments herein. However, as we may not consider the constitutionality of a statute if the case can be decided on some other ground (*People v. Carpenter*, 228 Ill. 2d 250, 264 (2008)), we postpone our examination of the first argument (and the second, which is related to it). We begin instead with the sufficiency of the evidence and the alleged errors in the trial court's factual findings.


¶ 21                        The Sufficiency of the Evidence

¶ 22        In a criminal trial, the State bears the burden of proving beyond a reasonable doubt all the material and essential facts constituting the crime. *People v. Weinstein*, 35 Ill. 2d 467, 470 (1966). However, once the trier of fact has found the defendant guilty of a crime, we must give deference to that determination in light of the fact finder's superior opportunity to see and hear the witnesses firsthand. Thus, on review, the relevant question is not whether the State met its burden but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Mills*, 356 Ill. App. 3d 438, 444 (2005). The determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991); *Collins*, 106 Ill. 2d at 261. This standard applies whether the evidence is direct or circumstantial and whether the verdict is the result of a jury trial or a bench trial. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). We will set aside a criminal conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 23        Count I of the indictment charged the defendant with intentionally making a false claim for workers' compensation benefits. The trial court did not make any factual findings regarding the evidence supporting this count. Rather, the trial court apparently confused the "false or fraudulent material statement or *** representation" that was the basis for the charge in count II with the false or fraudulent *claim* charged in count I, stating:

        "as to Count I, a false representation. [The defendant] made a false representation to his treating physicians as to his disability and his pain."

The trial court then went on to list other statements that it considered to be false or fraudulent. However, it never addressed the basis for its finding the defendant guilty of

-7-

making a false or fraudulent claim.

¶ 24    The defendant argues that he did not make a false claim, because it was undisputed that he sustained a tear in his right rotator cuff as a result of the accident. Indeed, he notes, Gallagher Bassett itself categorized his condition as a "compensable injury." Thus, he argues, his claim was valid and well-grounded, not false or fraudulent. The State argues that the defendant was not disabled from working, and thus both his initial application for benefits and his later section 19(b) petition were false.

¶ 25    An examination of the claim forms submitted by the defendant shows that neither required him to affirmatively state whether he was totally disabled from working. Rather, the initial application required only basic information about the time and place of the accident and a brief description of how it occurred and the resulting injuries. The State has not shown that any of the information the defendant provided on this form was false. To the contrary, the MRI evidence showed that the defendant's fall resulted in a genuine injury, namely, a torn rotator cuff. Because the term "claim" is not defined in the statute, it is debatable whether that term also encompasses the defendant's section 19(b) petition. We need not decide this issue, however, as even if the petition were included as part of the defendant's "claim for the payment of workers' compensation benefits" (820 ILCS 305/25.5(a)(1) (West 2006)), the State has not shown that any of the statements made on that petition form were false or fraudulent. We acknowledge that the form requires the claimant to aver that "I am unable to return to work at this time because of the injuries or disability caused by my employment, and I am not receiving Temporary Total Disability benefits or medical benefits." However, although the videotape showed the defendant carrying coffee and working with blueprints, and even straightening a fence support at one point, it is undisputed that at the time of his section 19(b) petition the defendant had been released to perform light-duty work only, and thus he could not return to work at Plote, which required an unrestricted release before an injured employee could return to work. Nothing in either the initial application for benefits or the section 19(b) petition required the defendant to state whether he was totally disabled from working, and thus his failure to disclose his temporary light-duty work did not render his workers' compensation claim either false or fraudulent.

¶ 26    We reach the same conclusion when we step back from the specific statements the defendant made in asserting his claim for workers' compensation benefits and look at the overall effect of his conduct. A claimant who is disabled from performing his regular job does not lose his eligibility for workers' compensation benefits merely by performing temporary light-duty work. *Choi v. Industrial Comm'n*, 182 Ill. 2d 387, 393-94 (1998); *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 179 (2000). The State argues, in essence, that the defendant was obligated to immediately disclose to the Commission his light-duty work for Beritus. However, section 25.5 makes criminal only affirmative fraud–a false or fraudulent claim or statement–not mere silence. *Cf. Benson v. Stafford*, 407 Ill. App. 3d 902, 927-28 (2010) (rejecting the argument that silence was sufficient to show fraud where language of contract prohibited only affirmative fraud). Even if section 25.5 could be read to encompass culpability for fraudulent concealment, the State has put forward no argument showing that the circumstances here were such that the defendant had a duty to speak. *Paul H. Schwendener, Inc. v. Larrabee Commons Partners*,

338 Ill. App. 3d 19, 31 (2003). Although the defendant would have had a duty to disclose his light-duty work at the hearing on his workers' compensation claim (so that his earnings from that work could be taken into account in determining the amount of benefits he was entitled to receive), that hearing has never been held. If the defendant's underlying workers' compensation claim had gone to hearing and the evidence had shown either that the defendant did not have a compensable claim or that some other aspect of his claim was fraudulent, we would have no difficulty in concluding that the State had proven that the defendant violated subsection (a) of section 25.5 relating to false or fraudulent claims. On the current record, however, there is insufficient evidence of such a violation. We therefore conclude that the defendant's conviction on count I must be reversed.

¶ 27    Indeed, the fact that no hearing was ever held on the underlying workers' compensation claim here causes us considerable concern. Section 25.5 is located within the Workers' Compensation Act, not the Criminal Code. The purpose of the Act is to provide workers with prompt compensation for income lost due to work-related injuries. *Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 530 (2006). Here, however, the parties have indicated that the workers' compensation claim remains unresolved over five years after it was filed. Although the documentary and video evidence presented at the defendant's criminal trial could certainly have been considered by the arbitrators and members of the Commission in making the initial decision as to the proper amount of benefits to which the defendant was entitled, Gallagher Bassett chose instead to report (and seek the prosecution of) the fraud it alleges here. This choice has derailed the normal prompt resolution of the workers' compensation case and raises the unseemly possibility that Gallagher Bassett in essence sought to make an end run around the Commission by obtaining a finding of fraud in a circuit court rather than allowing the Commission to make the first determination of the validity of the claim as required by the statutory scheme. Although it is not mandated by the statutory language, we urge both the antifraud unit of the Commission and the State's Attorney's office to consider the wisdom of deferring prosecution under section 25.5 of the Act until after the workers' compensation case has been heard or otherwise concluded, thereby avoiding the type of delay that has occurred here.

¶ 28    We turn to the sufficiency of the evidence supporting the conviction on count II. To secure a conviction on count II, which charged a violation of section 25.5(a)(2) of the Act, the State was required to prove that the defendant intentionally made a false or fraudulent material statement for the purpose of obtaining workers' compensation benefits. The trial court found that the defendant made several false or fraudulent statements. First, the trial court found that the defendant falsely told Hathaway that he was not working for anyone other than Plote and was not an independent contractor. Second, the trial court found that the defendant fraudulently misrepresented to Drs. Elias and Zoellick the level of his pain and inability to use his right hand and arm. We examine the evidence supporting each of these findings.

¶ 29    Considering the defendant's statements to Hathaway, we find that Hathaway's questions about whether the defendant was working for anyone else or acting as an independent contractor were ambiguous–that is, capable of being understood in different ways–because it was not clear what time frame she was referring to in her questions. The State argues that

Hathaway's questions were clearly directed to the time of the interview, and thus she was asking the defendant whether, on November 3, 2006, he was working for anyone other than Plote or acting as an independent contractor. However, the context of Hathaway's questions and her phrasing raise an equally strong or stronger inference that she was referring to the time of the accident. Immediately before the relevant questions, Hathaway had been asking about the manner in which the accident occurred, and thus her questions were directed toward the October 12, 2006, time frame. She then began asking questions about the defendant's employment, continuing to use the present tense. After stating "You work for Plote," Hathaway asked, "So you're full-time, correct?" These comments must refer to the time of the accident because, at the time of the November 3 interview, the defendant was no longer doing any work for Plote. Hathaway then stated, "you work the night shift," again apparently referring to the time of the accident, before asking, "Now do you work for anyone else?" Her next questions about being an independent contractor and whether the defendant owned a business were also in the present tense.

¶ 30    We find that the continuing use of the present tense when asking both about the terms of the defendant's employment at the time of the accident and also about other employment was confusing and could easily have led the defendant to believe that Hathaway was asking whether he had other employment at the time of the accident. There was no evidence that the defendant in fact had any other employment or was working as an independent contractor at the time of the accident. Thus, if the defendant understood Hathaway to have been asking about that time, there is no evidence that his statements were deliberately false or fraudulent. Moreover, the likelihood of confusion on the defendant's part was increased by the fact that the defendant had only a high school education, which he obtained in another country. Accordingly, we find that the evidence, even when viewed in the light most favorable to the State, did not establish beyond a reasonable doubt that the defendant intentionally lied to Hathaway when he answered her questions in the negative.

¶ 31    We reach a different conclusion regarding the defendant's statements to his doctors, however. The trial court found that the defendant intentionally misrepresented the extent of his disability and pain to the doctors who examined him. The trial court also noted that the defendant never told either of his doctors that he had been doing light-duty work during the fall of 2006, raising the inference that he was concealing this work in order to increase the level of disability to which his doctors would testify and to avoid being released to return to full-duty work. These findings were amply supported by the record. The evidence showed that the defendant consistently represented to Dr. Elias, his treating physician, that his level of pain was a 9 or 10 (on a range from 1 to 10), leading Dr. Elias to conclude that he was 85% or more disabled. These representations would suggest that the defendant could scarcely move without pain, and indeed the defendant told Dr. Elias on November 30, 2006, that he spent most of his time in bed and had to crawl to the bathroom. Contrary to these representations, however, the defendant had been working light duty at two construction sites for 27 days by that point. Indeed, the defendant worked in the morning on November 2, the same day that he later reported to Dr. Elias that his pain was between a 9 and a 10, with the result that Dr. Elias believed him to be 70% disabled on that day. Similarly, the defendant told Dr. Zoellick in April 2007 that he had a burning sensation radiating down his right arm

and could not raise that arm. Although Dr. Zoellick initially credited this report and believed that it would be six to eight weeks before the defendant could return to work, after Dr. Zoellick viewed the videotape he concluded that the defendant's reports of his disability were inconsistent with the video and that the defendant could return to work immediately.

¶ 32    Nor do we find any error in the trial court's conclusion that the defendant's misrepresentations to the doctors were intentional and made for the purpose of obtaining workers' compensation benefits. Although the defendant argues that there was no direct evidence of any intent to mislead his doctors or that he acted as he did in order to get benefits, the trier of fact is permitted to draw reasonable inferences from the evidence (*Steidl*, 142 Ill. 2d at 226), and that is what the trial court did here. The defendant makes much of Dr. Elias's testimony that, in his opinion, the defendant was not necessarily lying when he described his pain and incapacity, as back and neck pain are "dynamic" and can change from moment to moment. However, the trial court was not required to defer to Dr. Elias's opinion on the legal issue of whether the defendant's statements amounted to deliberate falsehoods. *Rybak v. Provenzale*, 181 Ill. App. 3d 884, 896 (1989). Moreover, Dr. Zoellick testified that the defendant's statements about his disability were directly contradicted by the defendant's movements in the video. The evidence was sufficient to sustain the trial court's finding of fraudulent intent.

¶ 33    The defendant also argues that the trial court made factual errors that contributed to an incorrect legal finding that he was guilty on count II. Specifically, the defendant notes that, in summarizing the evidence prior to ruling, the trial court mistakenly referred to Dr. Elias in describing Dr. Zoellick's testimony. The trial court's summary, however, begins by referring correctly to Dr. Zoellick and accurately describes Dr. Zoellick's testimony. Later in its summary, the trial court describes Dr. Elias and his testimony, and again its description is accurate. Thus, it is clear that the trial court's momentary reference to Dr. Elias instead of Dr. Zoellick when referring to Dr. Zoellick's testimony did not reflect any misunderstanding of the evidence but was merely a slip of the tongue. As such, it does not demonstrate any fundamental error affecting the trial court's reasoning or ultimate determination that the defendant was guilty of the charge. We find that the evidence was sufficient to support the defendant's conviction on count II.


¶ 34                    The Statute Is Not Unconstitutionally Vague or Ambiguous

¶ 35    Having addressed the defendant's third and fourth arguments, we now turn to his argument that section 25.5 of the Act is impermissibly vague and should therefore be held void.

"A criminal law may be declared unconstitutionally vague for either of two independent reasons. First, the statute may fail to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited. [Citations.] Second, a statute may be declared unconstitutionally vague if it fails to provide explicit standards for those who apply it, thus authorizing or even encouraging arbitrary and discriminatory enforcement. [Citations.]" *People v. Law*, 202 Ill. 2d 578, 582-83 (2002).

The defendant argues that the statute is unconstitutionally vague in both of these ways, but

-11-

as he provides no support for his assertion that the statute fails to provide adequate standards for those who apply it, we find this argument forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006); *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677 (2007). We therefore address only whether the statute is so vague that an ordinary person cannot understand what conduct it prohibits. Whether a statute is constitutional is a question of law, which we consider *de novo*. *Law*, 202 Ill. 2d at 582. We begin with the presumption that a statute is constitutional, and the burden of establishing that it is not must be borne by the party challenging its validity. *Id.*

¶ 36    The defendant contends that the statute is vague in that the terms "false or fraudulent" and "material representation" are not defined within the statute. This contention is meritless; these terms are within the daily vocabulary of ordinary people. "False" means untrue or "not genuine," and "fraudulent" means "intended to deceive." Webster's New Collegiate Dictionary 409, 453 (1979); see also *People v. Yarbrough*, 128 Ill. 2d 460, 473 (1989) (fraud is conduct that is "calculated to deceive"); *Rybak*, 181 Ill. App. 3d at 899 ("Fraud encompasses anything calculated to deceive, as in acts, omissions and concealment including *** silence if accompanied by deceptive conduct or suppression of material facts ***."). Likewise, "material" means significant or consequential, and a "representation" is a "statement or account made to influence opinion or action." Webster's New Collegiate Dictionary 702, 974 (1979). The statute does not attach any arcane or unexpected meanings to these terms. The defendant suggests that the trial court's use of a Webster's dictionary to illustrate the common meaning of these terms means that the statute is "overly broad," but he provides no explanation of what he means by this or why it would be a pertinent defect.[1] To the contrary, in construing a statute, courts give words their plain and ordinary meanings (*In re M.T.*, 221 Ill. 2d 517, 524 (2006)), and a nontechnical dictionary like Webster's is a repository of such ordinary definitions. The use of dictionary definitions to illustrate the commonly understood meaning of a term is perfectly legitimate. See *id.* at 535 (quoting Webster's Third New International Dictionary in construing the criminal statute at issue there). We therefore reject the defendant's argument that the statute is so vague that a person of ordinary intelligence is left to guess at the conduct it proscribes.

¶ 37    We also reject the defendant's argument that the rule of lenity applies. The rule of lenity is a tool of statutory construction under which any ambiguity in a criminal statute must be resolved in favor of the accused. *People v. Jones*, 223 Ill. 2d 569, 581 (2006). However, when the language of a criminal statute is clear and unambiguous, we must apply the statute without resort to tools of statutory construction such as the rule of lenity. *Id.* As the language of section 25.5(a) is clear and easily understood, the rule of lenity has no application here.

¶ 38    The defendant raises one final attack on the validity of section 25.5 that amounts to a different type of due process argument (although he does not label it as such), in that he complains that it is irrational and unfair to criminalize conduct that harmed no one. *M.T.*, 221

---

[1]Although a statute may be attacked as "overbroad" if it "discourages people from exercising their first amendment rights for fear of punishment" (*People v. Nitz*, 285 Ill. App. 3d 364, 371 (1996)), the defendant makes no such argument here.

Ill. 2d at 534-36 (a statute must bear a reasonable relationship to the harm the legislature intended to remedy by enacting it). He notes that section 25.5(a), unlike civil causes of action based on fraud, is not limited to cases in which the victim of the fraud reasonably relied on the fraudulent representations and thereby sustained some detriment. Compare 820 ILCS 305/25.5 (West 2006), with *Kinn v. Prairie Farms/Muller Pinehurst*, 368 Ill. App. 3d 729, 733 (2006) (reciting elements of a common-law fraud claim). Here, Infomax produced its report in mid-November 2006 and Gallagher Bassett therefore knew that the defendant had been working at a light-duty job by the time it issued payments to him in February and June of 2007. Thus, the defendant argues, it is clear that Gallagher Bassett did not rely on his alleged false statements to Hathaway or the doctors in deciding to issue the payments, and it is unfair to penalize him for making these statements. He asks us to remedy, through our interpretation of the statute, the legislature's supposed oversight in failing to require a showing of reasonable reliance and resulting harm. In essence, he argues that the application of the statute should be limited to instances in which the fraudulent conduct of the accused induced the victim to act in a way that it would not otherwise have done and caused it harm.

¶ 39    We cannot condone this approach, in which the validity of a criminal law is measured by its similarity to civil causes of action. Civil laws are designed to allow an individual to seek redress for wrongs done against him or her through the imposition of damages against the wrongdoer, or occasionally through nonmonetary equitable remedies. In considering whether it is just to impose damages, a court must determine whether the plaintiff was harmed by the wrongdoer's actions: there is little societal interest in enforcing rules and mores between individuals where no harm was caused by the infraction. By contrast, criminal laws are aimed at conduct that the legislature has determined is so pernicious that the State as a whole has an interest in deterring and punishing it. The legislature's assessment of the danger posed by the conduct need not rest on the harm done to any particular victim: it may encompass the likely risk of harm to society as a whole. For this reason, there are a variety of crimes that do not require the commission of any actual harm, including conspiracy, perjury, unlawful entry, the possession of certain contraband (drugs and drug paraphernalia, burglary tools, etc.), and the attempt to commit a crime. In each of these cases, the legislature has determined that the risk of harm to society as a whole from particular conduct (*e.g.*, unlawful entry into a home, or lying under oath and thereby subverting the judicial system) is sufficiently serious that the conduct should be punished regardless of whether the State can prove that the defendant's actions caused someone harm. The conduct of making fraudulent claims or statements in order to obtain workers' compensation benefits poses a similarly broad risk to the public by undermining the fairness and integrity of the workers' compensation system, which was designed to provide prompt and equitable compensation for employment-related injuries. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 463 (2010).

¶ 40    The legislature has wide discretion to establish criminal offenses and set the penalties for those offenses, limited by the constitutional guarantee that a person may not be deprived of liberty without due process of law. *Carpenter*, 228 Ill. 2d at 267. If the statute at issue does not affect a fundamental constitutional right, the test for determining whether it complies with substantive due process requirements is the rational basis test. *Id.* at 267-68. A statute

-13-

is constitutional under that test where "it 'bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective.' " *People v. Wright*, 194 Ill. 2d 1, 24 (2000) (quoting *People v. Adams*, 144 Ill. 2d 381, 390 (1991)).

¶ 41 Here, the purpose of the statute is plain on its face: section 25.5 of the Act seeks to deter workers from making fraudulent claims or statements intended to secure workers' compensation benefits to which they would not otherwise be entitled. In doing so, the legislature sought to preserve the monies already paid by employers for workers' compensation insurance, ensure that such funds were directed toward those with legitimate claims, and prevent workers' compensation insurance premiums from growing so exorbitant as to discourage businesses from operating in Illinois. See 94th Ill. Gen. Assem., Senate Proceedings, May 26, 2005, at 82-85 (floor debate on House Bill 2137) (comments of Senators Link, Dillard, and Cronin on the role of the antifraud provisions of the bill in correcting perceived abuses of the workers' compensation system and the importance of those provisions to the business community). The means chosen by the legislature–a statute criminalizing the making of fraudulent claims and representations for the purpose of obtaining workers' compensation benefits, regardless of whether the fraud resulted in harm to an identifiable victim–is rationally related to these purposes. *Wright*, 194 Ill. 2d at 24. The defendant's challenges to the constitutionality of section 25.5 therefore fail. As discussed in the next section, however, the defendant's arguments about fairness and harm to others–while not preventing a conviction under the Act–are relevant in assessing the penalty to be imposed for that conviction.

¶ 42               Restitution

¶ 43 The defendant's final argument relates to the amount of restitution he was ordered to pay. Section 25.5(b) of the Act provides that anyone convicted of violating section 25.5(a) "shall" be ordered to pay "complete restitution" to any person or entity that was defrauded. 820 ILCS 305/25.5(b) (West 2006). The total restitution that the defendant was ordered to pay Gallagher Bassett was $22,594.61, which included $5,923.50 in attorney fees relating to the criminal case; $5,105 for Dr. Zoellick's independent medical examination of the defendant; $9,671.05 for surveillance costs; about $1,418 for other investigation costs; and about $477 for medical records. The defendant contends that he should not have been ordered to pay the fees of Gallagher Bassett's attorneys that related only to his criminal trial, or the costs for the independent medical examination, because neither of these expenses was proximately caused by his alleged misrepresentations. The State argues that the defendant has forfeited this issue because he failed to file a motion to reduce his sentence in the trial court. The State also argues that the disputed expenses fall within the scope of the "complete restitution" required by the statute.

¶ 44 A defendant generally forfeits any arguments related to his sentence if he fails to challenge the sentence in the trial court, such as by filing a motion to reconsider or reduce the sentence. *People v. Fontana*, 251 Ill. App. 3d 694, 704 (1993). However, a trial court may only impose a sentence that is authorized, and any unauthorized aspect of a sentence is

void and may be attacked at any time:

> "The established rule is that where a court having jurisdiction over both the person and the offense imposes a sentence in excess of what the statute permits, the legal and authorized portion of the sentence is not void, but the excess portion of the sentence is void." *In re T.E.*, 85 Ill. 2d 326, 333 (1981).

Here, the defendant in essence is contending that certain items of restitution were unauthorized because they were not caused by his fraudulent statements. We thus address whether the lack of a causal connection between the offense of conviction and particular costs would render the imposition of restitution for those costs unauthorized and therefore void. See *People v. Harris*, 319 Ill. App. 3d 534, 536 (2001) (if trial court required the defendant to pay restitution for a cost that was not within the proper definition of "restitution," the sentence could be attacked as void).

¶ 45　　We begin by looking to the language of the statute itself to see what kinds of payments may be ordered. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). Section 25.5(b) of the Act requires that a person convicted must pay "complete restitution" to any person or entity that was "defrauded," without defining the term "complete restitution." 820 ILCS 305/25.5(b) (West 2006). However, if statutory language is clear and unambiguous when given its plain and ordinary meaning, that language must be applied. "Restitution" as a penalty in criminal cases has a well-established meaning in Illinois law: it refers to payment made to a victim in order to make the victim whole or to pay for the costs the victim incurred as a result of the defendant's actions. *Harris*, 319 Ill. App. 3d at 536; *Fontana*, 251 Ill. App. 3d at 707. "Complete restitution" therefore refers to full payment for all of the victim's expenses that are recoverable. Restitution may not be ordered for costs that are not related to the acts for which the defendant was convicted. *People v. Mahle*, 57 Ill. 2d 279, 284 (1974) ("trial court was not empowered to order restitution of sums" that were unrelated to the charges).

¶ 46　　Here, the defendant attacks two components of the restitution he was sentenced to pay: the costs associated with Dr. Zoellick's independent medical examination, and the attorney fees relating to the defendant's criminal trial. The first of these is clearly within the scope of costs for which the statute authorizes payment. The defendant suggests that Gallagher Bassett would have ordered an independent medical examination of him in any case, even if he had not misrepresented the extent of his injuries, but he cites nothing in the record to support this assertion. To the contrary, it is a fair inference that Gallagher Bassett was motivated to seek such an examination in this case because the defendant's statements to Dr. Elias about his level of pain and disability were contradicted by his videotaped actions. Accordingly, we reject the argument that the restitution order was void insofar as it required the defendant to pay the costs of the independent medical examination. *Harris*, 319 Ill. App. 3d at 537.

¶ 47　　Although the causal connection between the defendant's criminal conduct and Gallagher Bassett's attorney fees relating to his criminal trial is less obvious, these fees are likewise a valid exercise of restitution. Restitution is properly ordered for losses proximately caused by the criminal actions that form the basis for the defendant's conviction. *People v. Clausell*, 385 Ill. App. 3d 1079, 1082 (2008); *People v. Gallinger*, 252 Ill. App. 3d 816, 819 (1993).

In a workers' compensation fraud case such as this one, restitution must be focused on the out-of-pocket losses that flow from the defendant's fraudulent statements. Those losses might include, for example, benefits that were erroneously advanced based on a false understanding about the disability created by the misrepresentations; the cost of determining the true nature or extent of the injury; or the fees for the additional time that attorneys were required to devote to resolving the workers' compensation proceedings over and above that which would have been necessary in the absence of the fraud.

¶ 48    In this case, the defendant's fraudulent statements were sufficient to motivate Gallagher Bassett to report him to the antifraud division of the Commission and thence to the State's Attorney. Gallagher Bassett's involvement in the criminal proceedings might have ended there. However, the attorneys representing Gallagher Bassett in the workers' compensation proceedings before the Commission were subpoenaed to provide documents and witnesses in the criminal proceedings. It was the necessity of responding to these subpoenas, and not, as the defendant suggests, a desire to "monitor" the criminal proceedings, that resulted in the $5,923.50 in attorney fees that Gallagher Bassett incurred. These fees were clearly over and above those that would have been necessary in the absence of the fraud, and thus the restitution order is proper as it relates to these fees.

¶ 49    Although the defendant has not challenged the other expenses included in the restitution order, the possibility that they might be void under the principles discussed above requires us to consider whether they are proper. *People v. Thompson*, 209 Ill. 2d 19, 27 (2004) ("courts have an independent duty to vacate void orders and may *sua sponte* declare an order void"). Of particular concern to us is the cost of surveillance. This expense could not have been the result of the defendant's fraudulent statements, because Gallagher Bassett reached its decision to hire Infomax to conduct the surveillance before it was aware of the fraudulent statements made by the defendant. Gallagher Bassett decided to hire Infomax to conduct surveillance on the defendant sometime between October 12 (the date of the defendant's injury) and October 25, 2006 (the first date on which Infomax conducted surveillance). However, there is no evidence that the defendant had made any fraudulent statements by that time, much less that Gallagher Bassett knew of them. The defendant's first visit to Dr. Elias was on October 19, and the record does not show that anyone at Gallagher Bassett knew of the level of pain that he was reporting to Dr. Elias at that time. The surveillance had already begun by the time the defendant had his next visit with Dr. Elias, and it was completed before he filed his initial workers' compensation claim (which, as we have discussed, was not in itself fraudulent). Gallagher Bassett's decision to begin surveillance on the defendant might have been prudent, but given the circumstances we cannot say that it was proximately caused by the defendant's later fraudulent statements. Accordingly, the $9,671.05 portion of the restitution order that is based on the costs of surveillance is void and must be vacated. *T.E.*, 85 Ill. 2d at 333; *Mahle*, 57 Ill. 2d at 284.

¶ 50    Finally, the defendant argues that Gallagher Bassett was not a true "victim" that was "defrauded" (the word used in section 25.5(b) of the Act), because it potentially had the ability to pass the costs it sustained as a result of his fraudulent statements on to others, *i.e.*, Plote or its workers' compensation insurance carrier, Arch. The defendant is correct that a victim may recover restitution only for those expenses that truly came out of its own pocket

-16-

and generally may not assert claims on behalf of others. Here, however, the State submitted evidence that Gallagher Bassett paid the above costs itself, and there was no evidence that any of these costs were passed on to any other entity. Accordingly, Gallagher Bassett was "a person or entity" entitled to seek restitution under section 25.5(b) of the Act.[2]

¶ 51                                CONCLUSION

¶ 52     The legislature did not act irrationally or ambiguously in seeking to deter workers' compensation fraud by enacting criminal penalties for such fraud, and the defendant's conviction on count II is supported by the evidence. We therefore affirm the defendant's conviction on count II. However, because the evidence does not support the defendant's conviction on count I, we reverse that conviction. In addition, because $9,671.05 of the ordered restitution was not caused by the defendant's criminal acts, we must reduce the order of restitution to a total of $12,923.56. In all other respects, the judgment of the circuit court of Kane County is affirmed.

¶ 53     Affirmed as modified in part and reversed in part.

¶ 54     JUSTICE HUTCHINSON, specially concurring:

¶ 55     I concur in the majority's disposition based on the issues defendant presented in his appellate brief and on the record on appeal. I write separately to express my concern regarding the procedure by which the State was able to achieve restitution for Arch and Gallagher Bassett.

¶ 56     On April 22, 2009, the grand jury returned an indictment charging defendant with committing two offenses of workers' compensation fraud (820 ILCS 305/25.5(a)(1), (a)(2) (West 2006)). The indictment provided, in relevant part, that defendant:

"intentionally presented a false material representation for the payment of workers' compensation benefit, in that said defendant claimed to the Illinois Workers' Compensation Commission that he was totally disabled, based on an accident defendant stated occurred while employed at PLOTE construction company."

¶ 57     On March 2, 2010, the trial court allowed the State's motion to amend the indictment. The amendment to count I provided, in relevant part, that defendant:

"intentionally presented a false material representation for the payment of workers' compensation benefit, in that said defendant claimed to the Illinois Workers['] Compensation Commission, *his employer's worker[s'] compensation insurance*

---

[2]The special concurrence raises the concern that the last-minute amendments to the indictment that occurred in this case might have prejudiced the defendant. However, the defendant raised no such argument on appeal. While we do not disregard the ultimate fairness of the proceedings below, we decline to raise issues, except those involving voidness, not raised by the parties themselves. *People v. Givens*, 237 Ill. 2d 311, 323-24 (2010) (explaining the importance of limiting the court's review to those issues that have been properly raised and argued by the parties).

*provider, and to a worker[s'] compensation insurance claims adjuster* that he was totally disabled *and unable to work*, based on an accident defendant stated occurred while employed at Plote construction company." (Emphasis added.)

The amendment to count II provided, in relevant part, that defendant:

"intentionally presented a false material statement for the purpose of obtaining worker[s'] compensation benefits, in that said defendant claimed to the Illinois Workers['] Compensation Commission and *his employer's worker[s'] compensation insurance provider he was totally disabled and unable to work, and claimed to a worker[s'] compensation insurance claims adjuster* that he was totally disabled, *unable to work and not working for anyone else*, based on an accident defendant stated occurred while employed at PLOTE construction company." (Emphasis added.)

¶ 58 My concern lies in the propriety of how the State sought amendment, the lack of an objection by defense counsel, and the effect of the trial court's ruling granting the State's motion. Our supreme court has plainly stated that, "once an indictment has been returned by a grand jury, it may not be broadened through amendment except by the grand jury itself." *People v. Benitez*, 169 Ill. 2d 245, 254 (1996) (citing *People v. Kincaid*, 87 Ill. 2d 107, 124 (1981)). Underlying this rule is the policy ensuring that citizens' rights are not at the mercy or control of a prosecutor. *Benitez*, 169 Ill. 2d at 254 (citing *Kincaid*, 87 Ill. 2d at 124). Exceptions to this rule are found in section 111-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-5 (West 2010)).

¶ 59 The State presented this motion on the eve of trial, generally alleging that the defects were formal and that defendant would not be prejudiced by the amendment to the indictments. It appears that no objection was made by defense counsel to the proposed addition of two alleged victims that defendant purportedly defrauded, *i.e.*, the insurance provider (Arch) and the insurance claims adjuster (Gallagher Bassett). Because defendant posed no objection to the trial court and because defendant did not appeal the trial court's ruling, I decline to express an opinion as to whether the addition of Arch and Gallagher Bassett as "victims" was merely a formal change or whether it substantively broadened the scope of the indictment. Because of defendant's failure to challenge the trial court's ruling, I also decline to express an opinion as to whether defendant was prejudiced by the amendments. Although the majority did not express this reasoning in its analysis, once the trial court granted the State's motion to amend the indictment, both Arch and Gallagher Bassett were named victims and entitled to restitution pursuant to section 25.5(b) of the Act (820 ILCS 305/25.5(b) (West 2006)). Despite my declination to express an opinion, I raise the matter out of fairness to the parties and the proceedings.

¶ 60 Accordingly, on this record and based on the issues presented, I specially concur.